IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ANTHONY SPEARS, | ) | |
| | ) | |
| Plaintiff, | ) | No. 04 C 7040 |
| | ) | |
| vs. | ) | |
| | ) | Magistrate Judge |
| LOCAL NO. 134, INTERNATIONAL | ) | Arlander Keys |
| BROTHERHOOD OF ELECTRICAL | ) | |
| WORKERS; INTERNATIONAL | ) | |
| BROTHERHOOD OF ELECTRICAL | ) | |
| WORKERS, AFL-CIO; AND | ) | |
| KELSO-BURNETT CO. | ) | |

**MEMORANDUM OPINION AND ORDER**

Currently before the Court are Defendants' Motions for Summary Judgment. Plaintiff was hired by the Kelso-Burnett Co. ("Kelso") as a journeyman electrician. After two drug screening tests labeled Plaintiff's urine specimens "diluted," Kelso terminated Plaintiff; Plaintiff filed a grievance with his union, claiming that Kelso did not have just cause to terminate him. Plaintiff argues that his union, the International Brotherhood of Electrical Workers ("IBEW"), breached its duty of fair representation, and that Kelso terminated him in violation of Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185 et al. (West 2006). For the reasons set forth below, both Defendants' Motions are Granted.

**Background Facts**

In 2003, Ford Motor Company ("Ford") undertook a project to build a new conveyor at the Ford Chicago Assembly Plant (the "Plant"). Ford retained Lesco Design and Manufacturing Co., Inc.

("Lesco") to design and build the conveyor at the Plant. Lesco hired United Electric Co., ("United") an electrical contractor, to oversee and manage the journeymen electricians. United, in turn, hired Kelso to supply electricians to perform the electrical work at the Plant. After being awarded this contract, Kelso contacted the IBEW, and requested that the IBEW's National Maintenance Agreement ("NMA") be extended to cover the work being performed by Kelso at the Plaint. The IBEW agreed; the IBEW's NMA governed the terms and conditions of employment for all of Kelso's employees performing electrical work on that project.

Plaintiff is a journeyman electrician and a long-time member of Local 134, International Brotherhood of Electrical Workers ("Local 134"), and the IBEW. On July 1, 2003, Plaintiff called Local 134's job referral hotline, and learned that Kelso was hiring electricians for work at the Plant. Plaintiff requested and received a referral for the opening the next day.

Upon receiving the referral, Plaintiff went to the jobsite and met with Kelso's foreman, Bill Martin. Mr. Martin informed Plaintiff that he had to have a preemployment drug screening performed at the Ingalls Medical Center, a nearby health facility. Plaintiff agreed, and returned to the Plant after the test.

Bill Roberts, United's Superintendent at the Plant, received Plaintiff's drug screen report. The report contained the

notation "diluted specimen." Mr. Roberts informed Ken Cardwell, Lesco's Project Safety Manager, that he had received a "diluted specimen" result on a drug screening. Mr. Cardwell explained to Mr. Roberts that the "diluted specimen" notation was unacceptable under both Lesco's and Ford's policies, and that the candidate would have to be retested. Mr. Cardwell further stated that the candidate would have to be let go if the second result contained the diluted specimen notation.

Shortly thereafter, Mr. Martin informed Plaintiff that he would need to submit to a second drug test, because the results from the first test indicated that Plaintiff's sample was diluted. Plaintiff claims that Mr. Martin was unable to explain what, precisely, "diluted specimen" meant. Nevertheless, Plaintiff complied, returning to Ingalls for a second screening.

Plaintiff's second screening indicated that, once again, his specimen was diluted and that his creatinine levels were below expected levels. Based on his previous discussion with Mr. Cardwell, Mr. Roberts determined that Plaintiff failed to meet the requirements for working at the Plant. Messrs. Roberts and Martin met with Plaintiff on July 11, 2003, and informed him that he was being terminated due to the diluted specimen notations on his drug screening tests. Plaintiff notes, however, that the severance notice that Kelso gave him stated that he was terminated due to a reduction in workforce. Plaintiff left the

Plant and immediately contacted his Local 134 Business Representative.

**The Handling of Plaintiff's Grievance**

The IBEW participates in the National Maintenance Agreement ("NMA") program administered by the National Maintenance Agreement Policy Committee, Inc. ("NMAPC"). The NMAPC is a joint committee of labor and management representatives in the building trades industry. The NMA contains a five-step grievance procedure[1]. Steps 1 and 2 are handled by the local union representative, while Steps 3, 4, and if necessary, 5 are handled by the International Union Representative.

Consistent with the NMA's procedures, Plaintiff called Local 134 Business Representative Richard Kelly, after being notified of his termination. Mr. Kelly immediately undertook an investigation of Plaintiff's claims, and began gathering documentation and information in support of his claims. Plaintiff and Mr. Kelly had numerous telephone calls, and Mr. Kelly kept Plaintiff informed of his efforts to resolve Plaintiff's grievance. Plaintiff admits that he and Mr. Kelly

---

[1] Step 1 involves negotiations between the Employer's Supervisor and the Local Union Steward; Step 2, between the Business Representative and the Employer's Supervisor; and Step 3, between the International Union Representative and the Supervisor or Labor Relations Manager. At Step 4, the matter is submitted to the NMAPC for a decision. If the NMAPC cannot reach a decision, the parties may decide to pursue arbitration at Step 5.

4

talked approximately 100 times during Steps 1 and 2 of the grievance procedure, and that Mr. Kelly did everything that Plaintiff requested of him.

At Step 3, Plaintiff's grievance was transferred to the IBEW for further processing. The IBEW representative assigned to Plaintiff's case was Mike Daugherty. Plaintiff explained the events surrounding his termination to Mr. Daugherty at their initial meeting. Mr. Daugherty told Plaintiff that he had a good case, and that he would have a hearing in Washington. Plaintiff claims that, after their initial meeting, Mr. Daugherty never again initiated contact with him.

On or about August 4, 2003, a Step 3 grievance meeting was held, which was attended by Messrs. Daugherty and Kelly, on behalf of the IBEW; Stefan Lopata, Kelso's Vice President; Bradley Weir, Kelso's President; Robert Dawson, Kelso's Superintendent; and James Oliges, United's Vice President. At the meeting, the participants discussed, among other things, an undated letter written by Theodore Tylicki of Aristeo Construction, one of Ford's third-party safety coordinators. Mr. Tylicki opined that Plaintiff had, in fact, satisfied Ford's Construction Safety Guidelines, and that diluted specimens were acceptable.

Mr. Lopata countered that, contrary to Mr. Tylicki's assertions, he had confirmed with representatives from both Lesco

and Ford that a drug test indicating a "diluted specimen" was not considered a negative result and, therefore, that Plaintiff was not allowed to work on the project. In light of this, Kelso stood by its decision to terminate Plaintiff. After Kelso denied the grievance at Step 3, Jerry Westerholm, an International Representative of the IBEW, was assigned to Plaintiff's case.

Unable to obtain a resolution with Kelso, the IBEW moved the grievance to Step 4 of the grievance procedure, which calls for arbitration of the dispute before the NMAPC. On September 8, 2003, the IBEW forwarded its letter in support of Plaintiff's grievance to the NMAPC, highlighting Mr. Tylicki's opinion that Plaintiff's results satisfied Ford's requirements for working at the Plant. Kelso forwarded a position statement in support of its position that a drug screening test indicating a diluted sample was not acceptable.

The NMAPC's Grievance Review Subcommittee deadlocked and was unable to reach a decision. The NMAPC then referred Plaintiff's grievance to the full NMAPC pursuant to Step 4 of the NMA grievance procedure. The NMAPC reviewed both written and oral materials submitted by the parties. In a letter dated December 11, 2003, the NMAPC notified the parties that it was unable to reach a decision on the grievance, and was referring the matter back to the parties to proceed to Step 5 of the NMA"s grievance procedure, if they so chose.

Messrs. Westerholm and Daugherty continued investigating Plaintiff's grievance. On December 17, Mr. Daugherty informed Mr. Westerholm that Mr. Lopata of Kelso was holding firm. Mr. Daugherty forwarded Mr. Westerholm an email from Mr. Lopata, dated December 15, 2003, questioning the merits of the grievance and attaching IBEW Local 134's own drug testing policy, which states that diluted specimens will be considered invalid.

Mr. Westerholm instructed Mr. Daugherty to obtain a copy of the controlling site drug policy from Kelso. Mr. Westerholm emailed Mr. Lopata on December 18, 2003, requesting the policy, and Mr. Lopata responded the next day. On December 19, 2003, Mr. Lopata sent Messrs. Westerholm and Daugherty a copy of a letter from its employer, Lesco, dated August 12, 2003, which stated that it "is our policy to accept drug screening results of Negative. Comments such as dilute specimen are not acceptable."

On February 13, 2004, Mr. Lopata forwarded to Mr. Westerholm Lesco's Drug Policy Worksheet, and stated that his "hands were tied" with regard to Plaintiff's grievance, because Kelso was required to follow Lesco's policy. Mr. Westerholm responded on February 17, 2004, stating that the IBEW still intended to proceed to arbitration under Step 5 of the grievance procedure. Mr. Westerholm then requested additional information from Kelso concerning Lesco's drug policy.

That same day, Mr. Lopata forwarded to the IBEW a letter from Joe Osvart, a Safety Engineer at Fordland's Corporate Safety Office. Mr. Osvart's letter, also dated February 17, 2004, supported Kelso's position, stating that:

> Test results must be either Negative or Positive. Anything in-between will be reviewed with the employee and a Medical Review Officer prior to the employee going to work. A second sample may be required.
> 4. "If a drug test is needed," "An employee will be signed up for employment for a probationary period, pending the results of the initial drug screening. The OWNER has defined 'probationary period' as 72 hours after the drug testing has occurred.
> The employee in question has a probationary period on the initial drug test. With the results being 'diluted,' the employee in question does not meet the requirement of either Negative or Positive for that initial test. Any secondary testing would be done with the consent of the employee and the employer, however on subsequent testing there is no probationary period. The employee cannot work on Ford sites until testing is returned 'negative.'

Mr. Lopata also stated that Mr. Osvart told him that Theodore Tylicki of Aristeo Construction did not have the authority to speak on behalf of Ford concerning this matter.

Apparently, Mr. Kelly mailed Mr. Lopata a certified letter in early March of 2004 on Plaintiff's behalf. Mr. Lopata replied on March 5, 2004, taking issue with the "harsh tone" in MR. Kelly's letter, stating that "I think we have lost sight that Kelso-Burnett is one of the strongest supporters of the IBEW. I myself have a very close relationship with many IBEW members. I fail to understand why our actions have come under continued scrutiny. Aren't we all working for the same thing, a safe

8

workplace?"

Mr. Westerholm asked Mr. Kelly to forward him copies of Plaintiff's actual drug screening test results, which Mr. Kelly did on March 24, 2004. Mr. Westerholm noted that no where on the result did it say that Plaintiff had "passed." After reviewing all of the evidence, Mr. Westerholm concluded that the case could not be won at arbitration. Mr. Westernholm consulted with the IBEW's legal counsel to prepare a draft letter for IBEW President Edwin Hill, dismissing the grievance. The letter to International Vice President Lawrence P. Curley dismissing the grievance was executed by President Hill on April 22, 2004.

In the letter, President Hill listed three reasons for not pursuing arbitration in this matter: 1) neither of Plaintiff's drug screening results indicated that he had passed the tests; 2) Kelso and Ford produced documents indicating that a diluted sample result is unacceptable, undermining Mr. Tylicki's contrary opinion; and 3) Lesco directed Kelso to fire Plaintiff, therefore, "[e]ven if Lesco was wrong, Kelso Burnett had no real alternative. Lesco, however, would not be bound by the arbitrator's award, nor is it bound to accept the results of Local 134's program."

Plaintiff subsequently filed suit against the IBEW, Local 134, and Kelso. At his deposition, Plaintiff conceded that he had no issue with Local 134 and agreed to drop his suit against

them. At the close of discovery, both the IBEW and Kelso filed Motions for Summary Judgment.

## Summary Judgment Standard

A motion for summary judgment is properly granted where "there is no genuine issue as to any material fact, and . . . the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Summary judgment is not appropriate where there is "sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." *County of Vernon v. United States*, 933 F.2d 532, 534 (7th Cir. 1991). When considering a motion for summary judgment, the Court must view all facts in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). However, the Court need draw only reasonable inferences from the record in favor of the non-moving party. *Bank Leumi Le-Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir. 1991). It is not necessary to "draw every conceivable inference" in favor of the non-moving party. *Bank Leumi Le-Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir. 1991).

**Discussion**

Plaintiff's Complaint alleges that the IBEW breached its duty of fair representation, and that Kelso breached its obligations under the relevant Collective Bargaining Agreement ("CBA".) The Court will examine each claim in turn.

## I. IBEW Did Not Breach Its Duty of Fair Representation

In order to state a claim for the IBEW's breach of its duty of fair representation, Plaintiff must establish that the IBEW's investigation and/or decisions were arbitrary or taken in bad faith[2]. *Air Line Pilots v. O'Neill*, 499 U.S. 65, 67 (1991) (citing *Vaca v. Sipes*, 386 U.S 171 (1967)). Plaintiff's evidence fails to raise a question of fact on these points; the IBEW's investigation more than satisfied its duty of fair representation.

### A. The IBEW's Investigation and Decisions Were Not Arbitrary.

The United States Supreme Court has held that a union's decision not to pursue a grievance to arbitration is entitled to great deference. *Air Line Pilots Ass'n, Intern. v. O'Neill*, 499 U.S. 65, 78 (1991). Such decisions are deemed arbitrary only if they are "so far outside a 'wide range of reasonableness' as to be irrational." *Id.* at 78 (quoting *Ford Motor Co. v. Huffman*, 345 U.S. 330, 338 (1953)). "So long as a colorable argument

---

[2] Discriminatory union decisions are also actionable, but Plaintiff's Complaint does not allege discrimination.

11

could be made at the time of the union's decision to drop its support that the grievance is meritless (and the union did not then treat substantively similar grievances differently from the plaintiff's), the decision cannot be regarded as arbitrary." *Trnka v. Local Union No. 688*, 30 F.3d 60, 61 (7th Cir. 1994). Plaintiff's "burden on summary judgment, in other words, is not just to establish that his position is as plausible as the union's, but to show that the union's position 'could eventually be deemed not even colorable[. ]'" *McKelvin v. E.J. Brach Corp.*, 124 F.3d 864, 868 (7th Cir. 1997) (quoting *Trnka*, 30 F.3d at 61); *see also, Konen v. Int'l Bhd. Of Teamsters*, 255 F.3d 402, 407 (7th Cir. 2001).

Even reviewing the evidence in a light most favorable to Plaintiff, the Court readily concludes that the IBEW's position was not irrational. Plaintiff admits that his case was thoroughly investigated by his local union representative, Richard Kelly, but argues that the IBEW failed to conduct an adequate investigation, review relevant documents, and make necessary inquiries. However, at his deposition, Plaintiff conceded that he was unaware of any evidence or documents that the IBEW failed to uncover that may have assisted his case. *Garcia v. Zenith Electronics*, 58 F.3d 1171, 1176 (7th Cir. 1995)(noting that a "plaintiff must also establish both that the union acted at least arbitrarily *and* that the plaintiff was

12

actually harmed by the union's actions.") In addition, the Court disagrees that Messrs. Daugherty's and Westerholm's investigations were subpar; both men reviewed Plaintiff's version of events, explored the applicable drug policies, and advocated for Plaintiff's position in numerous meetings, phone calls, emails and letters with Kelso.

Next, Plaintiff complains that the IBEW failed to keep him properly apprized of the status of his grievance. Case law is clear, however, that "the failure to keep a grievant informed of the status of the grievance is not a breach of the duty of fair representation." *Beckman v. U.S. Postal Serv.*, 79 F. Supp.2d 394, 404-05 (S.D.N.Y. 2000); see also *Lampkin v. U.S. Postal Serv.*, No. 01 C 6063, 2004 WL 2211605, at *4 (N.D. Ill. Oct. 1, 2004) (Union's failure to notify grievant of the outcome at each stage of the grievance process does not support a claim of arbitrariness). In addition, "in order to show that a union's actions were arbitrary . . ., [a plaintiff] must show the outcome of her case would have been different if [the union] had reported to her more consistently." *Lampkin*, 2004 WL 2211605, at *4. Plaintiff has offered no such evidence here.

Plaintiff also neglects to explain how the IBEW's failure to procure copies of his drug tests and to speak to representatives from Ford and Lesco prior to the Stage 4 negotiations hurt his case. The IBEW clearly presented a strong case to the NMAPC; the

13

NMAPC deadlocked despite Kelso's strong evidence that a diluted specimen test result was not acceptable. Unfortunately for Plaintiff, the investigation conducted by Messrs. Daugherty and Westerholm after the NMAPC's December 11, 2003 decision turned up evidence supporting Kelso and undermining Plaintiff's position. Plaintiff has not directed the Court to any evidence that would have countered the damaging statements from Mr. Osvart, Ford's Corporate Safety Engineer, that Plaintiff's test results were unacceptable. Thus, even if the IBEW's investigation was deficient – and the Court does not agree that it was –- Plaintiff's failure to demonstrate that the outcome of his case would have been different if the IBEW had conducted a different investigation, dooms his claim. *Garcia,* 58 F.3d at 1176-77.

In conclusion, the IBEW conducted a thorough investigation into Plaintiff's claims and rationally concluded that the case could not be won at arbitration. The IBEW's decision was more than "colorable"; taken together, Mr. Overt's letter stating that diluted specimens were unacceptable and Mr. Lopata's evidence that Lesco ordered Plaintiff's termination were more than sufficient to justify the decision. Because Plaintiff is not able to demonstrate either "an egregious disregard for [his] rights," *Id.* 58 F.3d at 1176, or that the IBEW missed evidence or failed to make decisions that would have changed the ultimate outcome, Plaintiff's arbitrariness argument fails.

## B. The IBEW Did Not Act in Bad Faith.

Plaintiff has also failed to establish that the IBEW acted in bad faith in refusing to take his grievance to Step 5 arbitration.

The IBEW is not obligated to take all members' grievances to arbitration. *Vaca*, 386 U.S. at 191; *see also, Reed v. International Union of UAW*, 945 F.2d 198, 202-03 (7th Cir. 1991). Rather, it has the discretion to act in consideration of factors, such as the appropriate allocation of scarce resources, its relationship with its other members, and its relationship with the employer. *Rupe v. Spector Freight Sys., Inc.*, 679 F.2d 685, 691 (7th Cir. 1982).

In reviewing Plaintiff's allegations of bad faith, the Court must assess IBEW's subjective motivation in deciding to drop Plaintiff's grievance. *McKelvin*, 124 F.3d at 868. Courts have found that a union's failure to pursue a grievance for personal reasons or in retaliation for the union member's previous political affiliation demonstrate the requisite bad faith. *See, e.g., Higdon v. Entermann's Sales Co., Inc.*, 01 C 6973, 2002 WL 653896, at *7 (N.D. Ill. April 19, 2002). Similarly, dropping a potentially meritorious grievance because of a concern that it might result in future lawsuits against the union constitutes bad faith decisionmaking. *Ooley v. Schwitzer Div., Household Mfg. Inc.*, 961 F.2d 1293, 1303 (7th Cir. 1992).

Plaintiff alleges no personal animus or political retaliation in this case. Instead, Plaintiff claims that communications between IBEW officials and Kelso indicate that the IBEW was more interested in maintaining a strong relationship with Kelso than advancing his grievance. Specifically, Plaintiff claims that, after Mr. Lopata noted in his March 5, 2004 correspondence to IBEW representatives that they had "lost sight that [Kelso] is one of the biggest supporters of the IBEW," the IBEW got cold feet and abandoned his claim.

This evidence, standing alone, is insufficient to raise a question of fact as to whether IBEW acted in bad faith. Mr. Lopata's statement, expressing frustration with Mr. Kelly's adversarial tone, is simply too vague and too tenuous to support Plaintiff's allegation that the IBEW caved in response to pressure from Kelso. First, Mr. Lopata's remarks are simply not threatening. Next, the facts demonstrate that Mr. Westerholm was still pursuing Plaintiff's claim in March, *after* he received Mr. Lopata's March 5, 2004 correspondence. On March 24, 2004, Mr. Westerholm requested and then reviewed Plaintiff's drug screening test results. Those test results contained no notation that Plaintiff had passed the drug screening. The absence of this notation, combined with the evidence uncovered after the Step 4 NMAPC proceeding--which heavily favored Kelso's position that simply not failing a drug test is not sufficient for maintaining

employment--persuaded Mr. Westerholm to abandon his grievance. Plaintiff's evidence is simply too speculative to permit a more sinister inference; Plaintiff needs more evidence in support of his conspiracy theory to justify a trial. *See Caisse Nationale de Credit Agricole v. CBI Indus., Inc.*, 90 F.3d 1264, 1270 (7th Cir. 1996)(quotations omitted)(a party seeking to defeat a motion for summary judgment "must wheel out all its artillery to defeat it.")

## II. Kelso Did Not Breach the CBA

Claims under Section 301 of the LMRA, against employers for breaches of collective bargaining agreements, are viable only if the plaintiff can show that the union breached its duty of fair representation. *Brazinski v. Amoco Petroleum Additives Co.*, 6 F.3d 1176, 1179 (7th Cir. 1993). As the Seventh Circuit explained in *McKelvin*:

> When as in this case the collective bargaining agreement establishes a grievance procedure for processing claims for breach, with arbitration if the grievance procedure does not produce a satisfactory result, and the union is cast in the role of representative of the aggrieved worker in the grievance and arbitration processes, the worker cannot prevail in his section 301 suit merely by showing that his grievance is a just one. That is, he cannot show just that the company violated the collective bargaining agreement. He must also show that by arbitrarily refusing to press his grievance the union violated its duty to represent all members of the bargaining unit fairly.

124 F.3d at 869. Because Plaintiff has not demonstrated that the IBEW breached its duty of fair representation, his claim against

17

Kelso must also fail.

## Conclusion

The standard of proof for establishing a breach of the duty of fair representation is exceedingly high. Plaintiff's evidence falls far short of satisfying that standard. While his termination may seem unfair to Plaintiff, the IBEW's handling of his grievance was neither arbitrary nor undertaken in bad faith. In addition, Plaintiff's failure to establish unfair representation dooms his claim that Kelso violated the CBA. Therefore, the Court grants both Defendants' Motions for Summary Judgment.

Dated: April 25, 2006

E N T E R E D:

*/s/ Arlander Keys*
ARLANDER KEYS
United States Magistrate Judge